## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| **INTERACTIVE CONTENT ENGINES, LLC,** | |
| Plaintiff | **Case No. 2:25-cv-1227** |
| v. | **JURY TRIAL DEMANDED** |
| **GRUPO GLOBO,** | |
| Defendants | |

### ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Interactive Content Engines, LLC ("Plaintiff" or "ICE") hereby files this Original Complaint for Patent Infringement against Defendant Grupo Globo ("Grupo Globo" or "Defendant"), and alleges, upon information and belief, as follows:

### THE PARTIES

1.    Interactive Content Engines, LLC is a limited liability company organized and existing under the laws of the State of Hawaii with its principal place of business at 1381 Kaeleku Street, Honolulu, Hawaii 96825.  ICE is designated as a manager managed LLC and is managed by Hawaii Holdings, LLC, a limited liability company organized and existing under the laws of the State of Hawaii. Hawaii Holdings, LLC maintains a principal place of business at 9235 Wildcat Hill Court, Las Vegas, Nevada 89178.  Hawaii Holdings, LLC is managed by CL Management Corporation, which is a corporation organized and existing under the laws of the State of Nevada.

2.     Upon information and belief, Defendant Grupo Globo is a foreign entity organized and existing under the laws of Brazil, with a principal place of business located at Rua Lopes Quintas, 303, Jardim Botânico, Rio de Janeiro, Brazil.

3.     Upon information and belief, Defendant is a Brazilian media conglomerate comprising multiple wholly-owned and controlled subsidiary operations, including but not limited to a video content streaming platform known as Globoplay, as well as related content services marketed as Rede Globo and Canais Globo, among many others.  Such platforms are: (i) put into service in the United States and within this Judicial District; (ii) exercise of control over such platforms occurs in the United States and within this Judicial District; and (iii) the beneficial use of such platforms is obtained in the United States and within this Judicial District.  Such actions are attributable to Grupo Global by virtue of Grupo Global's advertising, promotion, instruction, development, implementation, and maintenance of the infringing architecture, as well as via Grupo Global's exercise of control over the consumer streaming applications.

4.     Defendant may be served by providing notice and service of process to its domestic affiliated company, Globo International New York, Ltd., through its registered agent for service as follows: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  Further on information and belief, Globo International New York, Ltd., enjoys privity with Defendant Grupo Global by virtue of its common ownership and corporate lineage, as well as via common employees and management.

5.     On information and belief, Grupo Globo makes, uses, sells, offers to sell, and otherwise provides digital content streaming programming and services to consumers throughout the State of Texas, including in this judicial District, and introduces such services into the stream of commerce knowing and intending that they would be extensively used in the State of Texas and in this judicial

District.  More specifically, and on information and belief, Grupo Globo makes, uses, sells, offers to sell, imports, and otherwise provides one or more of the following: (i) a Content Delivery Network (or "CDN") comprising a geographically distributed group of servers designed to deliver digital content, programming, and services to consumers throughout the State of Texas, including in this judicial District; (ii) a Video on Demand (or "VOD") platform comprising a virtual file system for delivering digital content, programming, and services to consumers throughout the State of Texas, including in this judicial District; and/or (iii) a Streaming Platform comprising a plurality of servers for delivering digital content, programming, and services (including but not limited to live streaming or real-time content and services) to consumers throughout the State of Texas, including in this judicial District.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and/or 1338(a).

7. This Court has personal jurisdiction over Defendant.  Defendant has continuous and systematic business contacts with the State of Texas.  Defendant directly conducts business extensively throughout the State of Texas, by distributing, making, using, offering for sale, selling, and/or advertising its services in the State of Texas and in this District.  Defendant has purposefully and voluntarily made its business services, including the infringing systems and services, available to residents of this District and into the stream of commerce with the intention and expectation that they will be purchased and/or used by consumers in this District.  Further, this Court has personal jurisdiction over Defendant based on its commission of one or more acts of infringement in this District and elsewhere in the State of Texas.

8. Defendant is subject to this Court's general and specific jurisdiction pursuant to due process and/or the Texas Long Arm Statute due at least to Defendant's substantial business in the State of Texas

and within this District, including through its past and ongoing infringing activities, because Defendant regularly does and solicits business herein, and/or because Defendant has engaged in persistent conduct and/or has derived substantial revenues from goods and services provided in the State of Texas and this District.  Further, Defendant has committed acts of infringement in this District by, among other things, offering to sell and selling products that infringe the Asserted Patents, including the Accused Instrumentalities as alleged herein, as well as providing service and support to its customers in this District.  Upon information and belief, Defendant, directly or indirectly, participates in the stream of commerce that results in products, including the Accused Instrumentalities, being made, used, offered for sale, and/or sold in the State of Texas and/or imported into the United States to the State of Texas.

9.      Venus is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, Defendant is not a resident of the United States, and thus may be sued in any judicial district, including this one, pursuant to 28 U.S.C. § 1391(c)(3).  *See also In re: HTC Corporation*, 889 F.3d 1349, 1357 (Fed. Cir. 2018) (holding that "[t]he Court's recent decision in TC Heartland does not alter" the alien-venue rule).

## **PATENTS-IN-SUIT**

10.     Plaintiff is the owner of all rights and title in and to United States Patent No. 7,437,472 ("the '472 Patent"), which issued on October 14, 2008, entitled "Interactive Broadband Server System," and United States Patent No. 7,644,136 ("the '136 Patent"), which issued on January 5, 2010, entitled "Virtual File System."  Collectively the '472 and '136 Patents are referred to herein as the "ICE Patents" or the "Patents-in-Suit."

11.     The inventions disclosed and claimed in the ICE Patents were developed by the founders, entrepreneurs, and engineers of ICE, including Mr. Steven W. Rose, among others.  Each of the

ICE Patents was assigned from the inventors thereof, and recorded with the United States Patent and Trademark Office at reel/frame: 0013605/0835; 0014140/0830; 0016037/0769; and 0016040/0057. These assignments were executed prior to issuance of the respective ICE Patents and are effective to convey to ICE all rights in and title to the ICE Patents, including the right to collect all damages available under law for infringement thereof.

12. ICE is a domestic company that was founded in 2002 and still exists today. ICE was formed for the purpose of developing systems operable to efficiently store, retrieve, and rapidly transfer large volumes of data to devices over a network without the need for specialized equipment. These advanced foundational systems were designed to accommodate highly fault tolerant transfers of media files – meaning the systems continue to operate without interruption even if process or component failures occur. Further, the systems accommodate low latency transfer. Both of these advantages are realized despite the ICE systems generally utilizing less costly, commodity components rather than specialized equipment.

13. More specifically, the inventions described and claimed in the ICE Patents comprise systems and methods for content storage and delivery which are particularly useful for providing Video on Demand (or "VOD") services, live streaming of content, and the like. Such applications generally require simultaneous fulfillment of many user requests for access to large media files. The inventions of the ICE Patents met this challenge by implementing an inventive and unconventional hierarchical, distributed system for media file storage and retrieval using non-specialized hardware components. The patented innovations of the ICE Patents have since become widely used by providers of VOD, audio on demand, and live streaming services as well as operators of content hosting and Content Delivery Networks (or "CDN's").

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    5

14.    The driving force behind development of the inventions disclosed and claimed in the ICE Patents was Mr. Steven Rose, ICE's founder and Chief Technology Officer.  Prior to forming ICE, Mr. Rose worked for Viaduct Corporation.  While there, Mr. Rose focused his efforts on the development of time delayed, satellite-based video streaming services for subscribers residing in the State of Hawaii.  This led to Mr. Rose consulting for Time Warner Cable in the mid-1990s to aid in the development of scalable content storage and delivery systems for VOD deployment.

15.    Mr. Rose contributed to the development and implementation of Time Warner's Full-Service Network ("FSN") which utilized set top boxes accessing Time Warner's network to retrieve media content.  The FSN attempted to provide, among other functionality, VOD service to subscribers in Orlando, Florida.  The FSN project was quickly abandoned by Time Warner due to the high cost of the set top boxes, network bandwidth limitations, and difficulty ensuring interoperability with end user devices.  Following FSN, Mr. Rose remained focused on development of an improved server and network architecture capable of addressing the problems that doomed FSN.  He founded or consulted for several startups in this space in the late 1990s and early 2000s, including Pangrac & Associates and ICE.

16.    Mr. Rose's work at ICE culminated in the design and development of the virtual file systems, interactive broadband servers, and synchronized data transfer systems that are disclosed and claimed in the ICE Patents, respectively.  These systems achieved scalable and highly fault tolerant storage, retrieval, and delivery of large data files, including media files.  These advantages made ICE's innovations uniquely suited for VOD, live streaming, and other similar network functionalities.  The '136 Patent, for example, discloses systems and components operable to provide "storage and delivery of streaming media content" using virtual file systems in which content is "distributed across and array of storage devices."  The specification states:

1. Field of the Invention

The present invention relates to interactive broadband server systems, and more particularly, to virtual file system *that manages and maintains information of data distributed across an array of storage devices*.

2. Description of the Related Art

It is desired to provide a solution for *the storage and delivery of streaming media content*.  An initial goal for scalability is from 100 to 1,000,000 simultaneous individual isochronous content streams at 4 megabits per second (Mbps) per stream, although different data rates are contemplated.

*See* '136 Patent at 1:18-28 (emphasis added).

17.    The ICE Patents highlight certain problems faced in this field relating to cost, bandwidth constraints, scalability, and fault tolerance.  *See, e.g.,* the '136 Patent at 1:41-44 and 1:52-61.  They note that the architecture and operation of conventional systems of the time were ineffective for delivering media content to many end users simultaneously.  Such deficient systems utilized one-to-one connections between a network processor gathering and transmitting media content and each end user receiving the media content.  As such, they were not scalable or fault tolerant.

18.    Conversely, the systems and methods disclosed in the ICE Patents use an inventive distributed array of processors and storage locations which are communicatively coupled and operate in concert to effect content storage and delivery.  The workload for transferring content to an end user is shared among several processors accessing their respective storage locations.  Content storage, accessing, and transfer is therefore scalable in accordance with the disclosures of the ICE Patents.  Accordingly, conventional limitations caused by bandwidth constraints were minimized.  An exemplary storage architecture disclosed in the ICE Patents is illustrated below (*see* '136 Patent at Fig. 1):



19.     The specification further explains as follows:

> The architecture described herein accommodates individual components of varying capability to avoid an installation being limited to the point in time when the initial system purchase was made. *The use of commodity components guarantees recent well proven technology, avoidance of sole sources, and the lowest cost per stream. Individual component failures are tolerated.*

> *See* '136 Patent at 2:54-60 (emphasis added).

20.     The deficient conventional systems were subject to bandwidth and mechanical limitations on content delivery volume and speed by virtue of the component architecture conventionally implemented thereby.  In the inventive architecture of the ICE Patents, however, the interactive content engine as taught stores content in a distributed manner to achieve benefits particularly suitable for the delivery of VOD and live-streaming media content.  *See, e.g.,* '136 Patent at 3:22-42.  The exemplary architecture is implemented for storage of media content as many discrete "chunks" and "sub-chunks."  *See id.* at 3:59-65.  These "chunks" are shown as storage locations in an exemplary embodiment of Fig. 1 (illustrated *supra*) and is explained, for example, in the '136

Patent at 4:1-11.  This storage methodology is described as "achiev[ing] the speed benefits of interleaved access":

> Each title (*e.g.,* video, movie or other media content) is not wholly stored on any **single disk drive 111**.  *Instead, the data for each title is divided and stored among several disk drives within the* **ICE 100** *to achieve the speed benefits of interleaved access*.  The content of a single title is spread across multiple disk drives of **multiple SPNs 103**.  Short "time frames" of title content are gathered in a round robin fashion from each drive in each **SPN 103**.  In this manner, the physical load is spread escaping the drive count limits of SCSI and IDE, a form of fail-safe operation is gained, and *a large set of titles are organized and managed*.

> *See* '136 Patent at 3:47-58 (emphasis added).

21.    In operation, when a title is requested from the interactive content engine by an end user, "user processes" are concurrently executed on a plurality of processors, each accessing their associated storage locations.  "The goal of a user process (UP) running on each 'user' SPN 103 is to gather the sub-chunks from its own disk plus the corresponding four sub-chunks from other user SPNs to assemble a chunk of video content for delivery."  *See* '136 Patent at 4:45-48.  These user processes are done under the direction of one or more "management" SPNs coordinating the larger task of delivery of requested media to end users.  *See id.* at 4:48-51 and 5:1-6.

22.    According to certain embodiments disclosed in the ICE Patents, a management processor and several "user" processors may communicate over a backbone switch to identify, access, and compile chunks and sub-chunks comprising a media file.  *See generally* '136 Patent at 6:15-9:45. Title maps are consulted to obtain lists of storage locations for the chunks and sub-chunks to be transferred.  *See id.* at 5:29-44; 8:33-49; and 10:1-20.  Distinct processes are initiated in a coordinated manner via a series of separate requests.  *See id.* at 6:4-14.  The appropriate directory entries identifying storage locations for sub-chunks are returned, which are then accessed and compiled for delivery by each of the several user processors acting in concert with one another. *See id.* at 6:51-7:10.

23.     The ICE Patents further disclose that several advantages over the conventional art are realized from use of the innovations disclosed therein, including improved system scalability and reliability, among others:

> By distributing content in this fashion, at least two goals are achieved. *First, the number of users that can view a single title is not limited to the number which can be served by a single set of SPNs, but by the bandwidth of all the sets of SPNs taken together.* Therefore, only one copy of each content title is required. The tradeoff is the limitation in the number of new viewers for a given title that can be launched each second, which is far less of a constraint than the wasted space and management overhead of redundant storage. A second goal is the *increase in overall reliability of the ICE 100*.

> *See* '136 Patent at 4:19-28 (emphasis added).

24.     The disclosure of the '136 Patent overlaps with that of the '472 Patent, to which it is a continuation within the same patent family. The systems and methods disclosed in the '472 Patent likewise implement an unconventional server architecture comprising processers connected by a switch and accessing storage locations to store, gather, and deliver media content. *See, e.g.,* '472 Patent at Abstract. An embodiment of an exemplary "interactive broadband server" disclosed is shown in Figure 2A of the '472 Patent (annotations added):

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    10



*FIG. 2A*

25.     The storage, processing, and delivery systems and methods disclosed in the ICE Patents have become widely used, especially in connection with CDN's, VOD, live streaming, and similar media delivery applications.  In fact, such services would not be possible on the scale that they are now provided by entities such as Grupo Globo, but for infringing use of the innovations claimed in the ICE Patents.

26.     The ICE Patents are each valid, enforceable, and were each duly issued in full compliance with Title 35 of the United States Code.

27.     The ICE Patents include numerous claims defining distinct inventions, and no single claim is representative (for purposes of infringement or validity) of the others.  By way of example, Claim 25 of the '472 Patent recites an "interactive broadband server system," whereas Claim 1 of the '136 Patent is directed to a "virtual file system."  Further, Claim 25 of the '472 Patent recites a "backbone switch including a plurality of bi-directional ports," whereas Claim 1 of the '136 Patent is not so limited.  Still further, Claim 1 of the '136 Patent recites a "management node," whereas Claim 25 of the '472 Patent is not so limited.  These important distinctions are merely

representative, as even a cursory review of the claims of the ICE Patents reveals numerous patentably distinct elements which preclude any single claim from being viewed as representative.

28.  The priority date of the ICE Patents is at least as early as November 28, 2001 (the "Priority Date" or "Date of Invention").  As of the Priority Date, and for at least the reasons set forth herein, the inventions as claimed in the ICE Patents were novel, non-obvious, unconventional, and non-routine.

29.  Further to this point, the ICE Patents each relate generally to unconventional architectures which achieve benefits over the conventional art, including but not limited to increasing the number of users that can view a single title, as well as increasing overall reliability of the system.  *See* '136 Patent at 4:19-44.

30.  In view of at least the foregoing, which is merely representative of the disclosures of the ICE Patents, the claims of the ICE Patents are not drawn to laws of nature, natural phenomena, or abstract ideas.  Although the systems and methods claimed in the ICE Patents are known and implemented now (and, as a result, are widely infringed), the specific combinations of elements and steps, as recited in the claims, were not conventional or routine as of the Date of Invention.

31.  Further, and in view of at least the foregoing, which is merely representative of the disclosures of the ICE Patents, the claims of the ICE Patents contain inventive concepts which transform the underlying non-abstract aspects of the claims into patent-eligible subject matter.

32.  Consequently, the claims of the ICE Patents recite methods and architectures resulting in improved functionality of the systems on which they are performed and represent technological improvements to the operation of computers as tools of trade, including because they recite unconventional architectures which achieve the benefits described herein *supra*.

33.     The foregoing facts not only establish a basis to find that the claims of the ICE Patents were unconventional and non-abstract as of the Date of Invention, they also comprise secondary indicia of non-obviousness.

34.     The ICE Patents were examined by a multitude of United States Patent Examiners, including: John Follansbee ('472 Patent) and Hassan Phillips ('472 and '136 Patents).  During the examination of the ICE Patents, the United States Patent Examiners searched for prior art in the following US Classifications: 709/231, 709/217, 709/219, 709/233, and 709/247.

35.     After giving full and proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiners each allowed all of the claims of the ICE Patents to issue.  In so doing, it is presumed that Examiners Follansbee and Phillips used their knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiners Follansbee and Phillips each had experience in the field of the invention, and that the Examiners properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the ICE Patents are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the ICE Patents are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiners Follansbee and Phillips.

36.     The ICE Patents are pioneering patents, and have been cited as relevant prior art in hundreds of subsequent United States Patent Applications, including Applications assigned to such technology leaders as IBM, Veritas, Dell, Cisco, Fuji Xerox, Hewlett-Packard, Microsoft, Pure Storage,

Siemens, Texas Instruments, Juniper Networks, Marvell, Research in Motion, Hitachi, Dataram, Sony, Futurewei, Solidfire, Netapp, Amazon, and the Massachusetts Institute of Technology.

37.    The claims of the ICE Patents were all properly issued, and are valid and enforceable for the respective terms of their statutory life through expiration, and are enforceable for purposes of seeking damages for past infringement even post-expiration.  *See, e.g., Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.,* 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent is not viewed as having 'never existed.'  Much to the contrary, a patent does have value beyond its expiration date.  For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286") (internal citations omitted).

38.    The nominal expiration date for the claims of the ICE Patents is no earlier than January 25, 2026 for the '136 Patent, while the '472 Patent is recently expired.

## THE ACCUSED INSTRUMENTALITIES

39.    Upon information and belief, Grupo Globo makes, owns, operates, uses, sells, offers for sale, or otherwise exercises control over interactive broadband server systems and/or virtual file systems in the form of one or more Content Delivery Networks (or "CDN's") for delivering digital media content to connected subscriber and/or end user devices, including as required by client customers of Grupo Globo.  On information and belief, such methods and systems are implemented by Grupo Globo in the form of a plurality of interconnected storage systems, servers, processors, and switches which are comprised of hardware and software (including source code and mobile applications).  On information and belief, such hardware and software are made, used, installed, maintained, sold, offered for sale, and tested in the United States on the authority and under the direction or control of Grupo Globo and are used by consumers in the United States and within this District.  Collectively, the foregoing components operate as a single controlled apparatus for

delivering digital media content to subscribers and customers in the United States for the reputational and economic benefit of Grupo Globo.  Collectively, all of the foregoing comprises the "Accused Instrumentalities" and are broadly marketed by Grupo Globo as "Globoplay."  It is expressly stated and understood that certain details concerning the infringing systems as implemented by Grupo Globo are uniquely known to Grupo Globo and are beyond public view. As such, discovery (including source code inspection) is necessarily required prior to a complete and fully informed identification of the infringing system components and functionalities.

### COUNT I
### Infringement of U.S. Patent No. 7,437,472

40.    Plaintiff incorporates the above paragraphs by reference.

41.    Upon information and belief, Defendant owns and/or controls the operation and/or utilization of the Accused Instrumentalities and generates substantial financial revenues therefrom, including reputational advantages and the convoyed sales of related products and services to its client customers.

42.    Upon information and belief, Defendant has directly infringed at least Claim 25 of the '472 Patent by making, using, testing, selling, and/or offering for sale the Accused Instrumentalities.  The Accused Instrumentalities themselves were specially configured by Defendant in a manner consistent with the claimed architecture to directly perform all infringing steps and comprise all infringing elements.  Further and/or in the alternative, direct infringement exists when each individual consumer in the United States uses the Accused Instrumentalities, for which Defendant is jointly and/or vicariously liable.  In the alternative, such infringement exists under the Doctrine of Equivalents in a manner to be detailed after technical discovery and the expert inspection of Defendant's source code.

43.    Further on information and belief, Defendant directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States, including via its Internet domain web pages and/or software applications, as well as via its internal systems and interfaces.  Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities.  Such testing and/or legal compliance necessarily requires Defendant to make and use the Accused Instrumentalities in an infringing manner.  Still further, Defendant is a direct infringer by virtue of its branding and marketing activities, which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities.

44.    Upon information and belief, the Accused Instrumentalities comprise a subscription-based video streaming service that allows users to watch content (including, but not limited to, video content) on an internet-connected device such as a laptop and/or smartphone (client/user device).  Further, on information and belief, the Accused Instrumentalities run on 'globocdn', which includes origin servers and Globo Points of Presence (PoPs/edge servers) (collectively constituting an "interactive broadband server system") for storing and delivering the video/media files to the user's client device.  On information and belief, such apparatus is installed and used in the United States, and such apparatus performs the infringing steps entirely within the United States and/or for the benefit of users located within the United States.

45.    As noted, the Accused Instrumentalities infringe at least Claim 25 of the '472 Patent.  The claim chart attached hereto as Exhibit A identifies specifically how each element of such claim is believed to be satisfied by the Accused Instrumentalities.

46.    The foregoing infringement on the part of Defendant has caused past injury to Plaintiff.  The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '472 Patent.

47.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

**COUNT II**
**Infringement of U.S. Patent No. 7,644,136**

48.    Plaintiff incorporates the above paragraphs by reference.

49.    Upon information and belief, Defendant owns and/or controls the operation and/or utilization of the Accused Instrumentalities and generates substantial financial revenues therefrom, including reputational advantages and the convoyed sales of related products and services to its client customers.

50.    Upon information and belief, Defendant has directly infringed at least Claim 1 of the '136 Patent by making, using, testing, selling, and/or offering for sale the Accused Instrumentalities.  The Accused Instrumentalities themselves were specially configured by Defendant in a manner consistent with the claimed architecture to directly perform all infringing steps and comprise all infringing elements.  Further and/or in the alternative, direct infringement exists when each individual consumer in the United States uses the Accused Instrumentalities, for which Defendant is jointly and/or vicariously liable.  In the alternative, such infringement exists under the Doctrine of Equivalents in a manner to be detailed after technical discovery and the expert inspection of Defendant's source code.

51.    Further on information and belief, Defendant directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States, including via its Internet domain web pages and/or

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    17

software applications, as well as via its internal systems and interfaces. Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities. Such testing and/or legal compliance necessarily requires Defendant to make and use the Accused Instrumentalities in an infringing manner. Still further, Defendant is a direct infringer by virtue of its branding and marketing activities, which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities.

52. Upon information and belief, the Accused Instrumentalities comprise a subscription-based video streaming service that allows users to watch content (including, but not limited to, video content) on an internet-connected device such as a laptop and/or smartphone (client/user device). Further, on information and belief, the Accused Instrumentalities run on 'globocdn', which includes origin servers and Globo Points of Presence (PoPs/edge servers) (collectively constituting an "interactive broadband server system") for storing and delivering the video/media files to the user's client device. On information and belief, such apparatus is installed and used in the United States, and such apparatus performs the infringing steps entirely within the United States and/or for the benefit of users located within the United States.

53. As noted, the Accused Instrumentalities infringe at least Claim 1 of the '136 Patent. The claim chart attached hereto as Exhibit B identifies specifically how each element of such claim is believed to be satisfied by the Accused Instrumentalities.

54. The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiff. The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '136 Patent.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

55.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

## COUNT III
## Knowledge and Willfulness

56.    Plaintiff incorporates the above paragraphs by reference.

57.    Defendant has been on actual notice of the ICE Patents since at least as early as the date it received service of this Original Complaint.  In the alternative, Defendant has been (or should have been) on actual notice of the ICE Patents since at least August 24, 2022, by virtue of Defendant's awareness of the patent infringement lawsuit filed by ICE against Rumble USA, as well as by virtue of subsequent lawsuits as filed by Plaintiff in this space.

58.    On information and belief, Defendant has a policy or practice of not reviewing the patents of others.  Further on information and belief, Defendant instructs its employees to not review the patents of others for clearance or to assess infringement thereof.  As such, Defendant has been willfully blind to the patent rights of Plaintiff.

59.    On information and belief, the infringement of the ICE Patents by Defendant will now be willful as a result of the filing and service of this Complaint.

60.    In addition or in the alternative, in view of the filing and service of this Complaint, Defendant now has knowledge and continues these actions and it indirectly infringes by way of inducing direct infringement by others and/or contributing to the infringement by others of the ICE Patents in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, infringing services for use in systems that fall within the scope of the claims of the ICE Patents.  This includes without limitation, one or more of the Accused Instrumentalities by making, using, importing offering for sale, and/or selling such services, Defendant injured Plaintiff and is thus liable to Plaintiff for infringement of the ICE Patents under 35 U.S.C. § 271.

61.     Now with knowledge of the ICE Patents, Defendant induces infringement under Title 35 U.S.C. §
        271(b).  Defendant will have performed actions that induced infringing acts that Defendant knew
        or should have known would induce actual infringements.  *See Manville Sales Corp. v. Paramount
        Sys., Inc.,* 917 F.2d 544, 553 (Fed. Cir. 1990), quoted in *DSU Med. Corp. v. JMS Co.,* 471 F.3d
        1293, 1306 (Fed. Cir. 2006) (*en banc* in relevant part). "[A] finding of inducement requires a
        threshold finding of direct infringement – either a finding of specific instances of direct
        infringement or a finding that the accused products necessarily infringe."  *Ricoh v. Quanta
        Computer,* 550 F.3d at 1325, 1341 (Fed. Cir. 2008) (citing *ACCO Brands, Inc. v. ABA Locks
        Manufacturer Co.,* 501 F.3d 1307, 1313 (Fed. Cir. 2007)).

62.     Plaintiff may rely on direct and/or circumstantial evidence to prove the intent element.  *See Fuji
        Photo Film Co. v. Jazz Photo Corp.,* 394 F.3d 1368, 1377 (Fed. Cir. 2005) ("A patentee may prove
        intent through circumstantial evidence"); *see also Water Techs. Corp. v. Calco, Ltd.,* 850 F.2d 660,
        668 (Fed. Cir. 1988) ("While proof of intent is necessary, direct evidence is not required; rather,
        circumstantial evidence may suffice").

63.     At least upon the filing and service of this Complaint, Defendant has taken active steps to induce
        infringement, such as advertising an infringing use, which supports a finding of an intention for
        the Accused Instrumentalities to be used in an infringing manner.  *See, e.g., Metro-Goldwyn-
        Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 932 (2005) (explaining that the contributory
        infringement doctrine "was devised to identify instances in which it may be presumed from
        distribution of an article in commerce that the distributor intended the article to be used to infringe
        another's patent, and so may justly be held liable for that infringement").

## **PRAYER FOR RELIEF**

WHEREFORE, Interactive Content Engines, LLC respectfully requests the Court enter judgment against Defendant as follows:

1. Declaring that Defendant has infringed the Asserted Patent(s);

2. Awarding Interactive Content Engines, LLC its damages suffered because of Defendant's infringement of the Asserted Patent(s);

3. Awarding Interactive Content Engines, LLC its costs, reasonable attorneys' fees, expenses, and interest; and

4. Granting Interactive Content Engines, LLC such further relief as the Court finds appropriate.

## **JURY DEMAND**

Plaintiff Interactive Content Engines, LLC respectfully demands trial by jury, under Fed. R. Civ. P. 38.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Dated:  December 17, 2025

Respectfully Submitted

*/s/ M. Scott Fuller*

M. Scott Fuller
   Texas Bar No. 24036607
   Georgia Bar No. 100968
   sfuller@ghiplaw.com
Randall Garteiser
   Texas Bar No. 24038912
   California Bar No. 239829
   rgarteiser@ghiplaw.com
Christopher A. Honea
   Texas Bar No. 24059967
   California Bar No. 232473
   chonea@ghiplaw.com

**GARTEISER HONEA, PLLC**
119 W. Ferguson Street
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (903) 405-3999

**ATTORNEYS FOR PLAINTIFF
INTERACTIVE CONTENT ENGINES, LLC**